On effect of giving instruction as to reasonable doubt on duty of court in criminal case, in absence of request to charge with respect to circumstantial evidence, see note in 15 A. L. R. 1056.

---

STATE, Respondent, v. PEIFER, Appellant.

(207 N. W. 547.)

(File No. 5574.   Opinion filed March 5, 1926.)

1.   Larceny—Evidence—Where State Contended Accused a Conspirator in Larceny of Steer, His Conversation With Conefendants Held Incompetent as Meaningless, and Not Rebuttal.

Where state contended that accused was a conspirator, with others, in the larceny of a steer, his conversation with them had in jail, in which the word "paunch" was used and they requested and he promised to do act of undisclosed nature, and then secure witnesses to go and look, was incompetent, being meaningless, and not rebuttal.

2.   Larceny—Conspiring—Evidence Held Insufficient to Establish Conspiracy to Steal a Steer Against One Absent at the Time.

Evidence held insufficient to sustain charge of conspiracy to steal steer, claimed to have been butchered at accused's homestead during his absence.

3. **Larceny—Accomplices—Evidence Held Insufficient to Show Accused Accessory, After the Fact in the Larceny of Steer (Rev. Code 1919, Sec. 3595).**

Evidence held to not show accused an accessory, after the fact in larceny of steer, under Rev. Code 1919, Sec. 3595.

4. **Witnesses—Cross-Examination—Trial—Accused Entitled to Cross-Examine the Officers Who Arrested Him as to Conversation and Conduct About Which They Testified, and Undue Limitation is Error.**

Accused was entitled to cross-examine the officers who arrested him as to the conversation and conduct of the parties at the time of the arrest, where they had testified to transactions and conversations at such time, and undue limitation was error, though court has a broad discretion.

Appeal from Circuit Court, Butte County; Hon. JAMES McNENNY, Judge.

Max Peifer was convicted on an information charging him with larceny of a steer, and he appeals from the judgment and order denying new trial. Reversed.

*Harry P. Atwater,* of Sturgis, for Appellant.

*Buell F. Jones,* Attorney General, and *Bernard A. Brown,* Brief Attorney, of Pierre, for the State.

POLLEY, J. Appellant was convicted upon an information charging him, together with William J. B. Guffy, Roy W. Howind, and H. D. Witherill, with the larceny of a certain steer described in the information as: "One red, white-faced steer of the goods and property of Henry Karrels."

Numerous errors predicated upon the admission and rejection of evidence, upon the refusal to give requested instructions, and upon the insufficiency of the evidence to support the verdict are assigned as grounds for a new trial. An understanding of the case sufficient to pass upon either of the questions raised by the assignments requires an extended statement of the facts.

The evidence shows that appellant was the owner of a government homestead in the southeasterly corner of Butte county. On this homestead he had a dwelling house, a barn, a blacksmith shop, a stock corral adjacent to the barn, and a fence inclosing part or all of said homestead which consisted of a section of land. The surrounding country is rough and broken, and sparsely settled. It was not adapted to farming and the evidence does not show

that any portion of appellant's homestead was or ever had been, farmed or cultivated. Appellant did not live on this place himself and had not lived there for at least two years prior to his arrest. He did, however, have some cattle in his pasture or running on the adjacent range, and the defendant Witherill was, and for some two years past had been, living in appellant's house. Appellant himself made his home with his father and mother on their farm at some distance from his own place, and assisted his father, John Peifer, with the farm work. Appellant's place was on the north side of the Belle Fourche river and several miles from the river. The John Peifer place was on the south side of the river. It was the custom of appellant to go over to his own place occasionally; usually on Sundays and at intervals of two or three weeks, though possibly oftener at times. In going from the John Peifer place to appellant's place it was necessary to travel several miles along the road leading to the town of Vale, then turn north to a bridge crossing the river, then over broken country through numerous gates to appellant's place.

On the morning of September 26, 1923, the witnesses Fred Westgate and J. D. Heil, two deputy state sheriffs, met the defendant Guffy, about 20 miles from Sturgis, traveling toward Sturgis in a Ford Car. He was about 15 miles from appellant's place. They stopped Guffy and in a box on the rear of the car found four quarters of freshly butchered beef. They arrested him and took him and his car and load back to Sturgis. Later in the day the above-named witnesses, together with John Emerson, sheriff of Meade county, and one Baldwin, both of whom were witnesses for the state, went to appellant's said place. They arrived there between 8 and 9 o'clock that evening. When they arrived they found appellant alone in the house. They searched the premises and found unmistakable signs that a beef had been butchered there very recently. They found three butcher knives with fresh blood on them and a meat saw smeared with blood and tallow. In a kettle on a stove in the kitchen was a partly cooked beef heart. It was not cooking at the time, but had been and the water in the kettle was still hot. There was also a pot of beans on the stove. In the corral by the barn they found a block and tackle that had apparently been used to hang a beef. Nearby was a bloody ax. There was fresh blood on the block and tackle and

on the ground and on the corral, and nearby lay the entrals of a recently butchered animal. These various tools and articles were all lying about in apparenty natural positions. Certainly no attempt had been made to conceal any of them, or the purpose for which they had been used. When the witness Westgate went to the corral, he found inclosed a cow and a yearling steer. The steer was branded H A H, and this brand was owned by Frank Keffler. Who owned the cow is not shown. The witness Emer-·son placed appellant under arrest, and about 10 o'clock that night the witnesses prepared to leave appellant's place to go to another house in the neighborhood. They took appellant with them, but before they started appellant was permitted to go out to the barn to hang up his saddle. While he was there he opened the corral gate and permitted the cow and steer above mentioned to escape, and they went out through the gate on the run. The entire party then left the place, but returned about 4 o'clock the following morning. On their return one of the officers proceeded to make a fire in a cook stove in the kitchen. He testified that there were three stoves in the kitchen; one a cook stove set up, an oil stove set up, and a cook stove not set up. When the witness opened the stove to clean out the fire box, he found a piece of fresh beef hide rolled up tight and more or less scorched and burned. He testified that he saw some sparks of fire in the ashes, showing there had been a fire in the stove very recently. Further search was made after daylight and other pieces of beef hide were found about the barn and blacksmith shop. At least one of these pieces of hide was fresh. On one of them was a brand, but whose brand it was does not appear. It is claimed by the prosecution that there was a brand or part of a brand on the piece of hide that was found in the stove, but it is not set out in the record and whose brand it was is wholly a matter of conjecture. These officers testified that in or near the corral a short distance from the barn they found the remain of 10 paunches. This evidence was admitted on the theory that appellant had been engaged in the wholesale slaughter of beef at this place. It was also shown that defendant Guffy had visited appellant shortly—only a few days—prior to the finding of the beef, and that they had been seen together on the road between the John Peifer place and appellant's place. But this evidence is misleading and of no pro-

bative force whatever. They were seen on the road together, but this road also leads to the town of Vale, and they were not seen on the road leading from the Vale road to appellant's place. There is no evidence that Guffy was ever at appellant's place.

On behalf of appellant it was shown that on the day prior to Guffy's arrest appellant worked in the hay field on his father's farm all day. A hired man, who worked for John Peifer, and whose veracity is not questioned by the state, testified that he worked in the field with appellant all day the day prior to Guffy's arrest; that he ate supper with him that evening; that he slept with him that night at the John Peifer place, and that he saw him about the place until some time after noon on the following day, when the witness left the place to go to Vale; that about 3 o'clock in the afternoon of that day he again saw appellant driving along the road in a Dort car. He was on the road leading to the bridge across the Belle Fourche river and from thereon to his place north of the river. This was in the afternoon of the day on which the witnesses had arrested Guffy on the road to Sturgis with the beef. These facts show conclusively that appellant was not present at the time of the butchering. This is admitted by counsel for the state in the following language:

"It is true there is not one word of evidence tending to show that defendant actually committed the act or acts by which the larceny was effected, or that he was present at the time the circle K S steer was originally taken."

But it is contended by the state that appellant was a conspirator in the crime charged, and in support of such contention points to the fact that appellant and Guffy were seen on numerous occasions traveling together toward appellant's homestead, where defendants Howind and Witherill were living at the time of the alleged larceny; to the fact that appellant was found at his homestead on the day the steer was butchered; to the fact that he opened the gate and released the cow and the H A H steer that were in his corral on the evening of his arrest; and to the further fact that appellant had a conversation at the Butte county jail on the evening of November 7, in which conversation the word "paunches" was used. But the weakness of this contention is: First, that these facts, if proven, do not necessarily lead to the conclusion that a conspiracy to commit a crime existed; and, sec-

ond, the evidence does not establish such facts. There is not a syllable of evidence in the record that appellant and Guffy were ever seen on the road together going in the direction of appellant's homestead except on the road leading from the John Peifer place to Vale. They were never seen together on the road leading from the Vale road to the bridge or to appellant's homestead or on the north side of the river; nor is it shown that Guffy was ever at appellant's homestead.

The fact that appellant released the cow and the H A H steer before leaving his place on the night of his arrest is of no probative effect whatever. The entire party was leaving. Nothing had been said about returning. Appellant did not know when he or any one else whould be there again. These two animals were shut up in the corral without feed or water and the most natural thing in the world for any one to do was to open the gate and let them go. The fact that they did all return on the following morning is wholly immaterial. Moreover, it was not shown that appellant put those animals in the corral or that he knew who did put them there. He was interrogated about them by one of the officers when the gate was opened, and appellant said that he did not know anything about them; that they were there when he arrived at about 5 o'clock that evening.

[1] The conversation referred to, as having taken place at the jail on the evening of November 7, was utterly incompetent for any purpose whatever. In the first place there is not sufficient of the conversation given to convey any meaning whatever; and in the second place said conversation was fully expained by the testimonly of the Meade county sheriff. The conversation appears to have taken place during or just prior to the trial. The witness was the wife of the Butte county sheriff. The defendants Guffy, Howind and Witherill were in the jail. Appellant came to the jail and talked to them through a wicket in the door. The witness said:

"They was having conversation, and I paid no attention at first till I heard the word 'paunch' and then after that I did, and I heard Guffy say to Peifer, 'You go do that,' Peifer said, 'I will;' and Guffy said, 'You go do that sure.' Peifer said, 'I will.' and Guffy said then, "You go get Tom Stevenson and John Emerson to look; Westgate won't go because he and that ——— have

gone home; Tom and Emerson will have more influence.' To this ·
appellant replied, 'I will.' "

John Emerson, sheriff of Meade county, testified that on the
morning following said conversation appellant's counsel asked him
to go out to appellant's homestead and indicate the piles that he
(the witness) claimed were paunches. This was a perfectly proper
thing to do and the whole matter was so utterly trivial that we
are surprised that the prosecution offered it in evidence and that
the court admitted it.    Moreover, it was not rebuttal in any
sense, and the court erred in overruling appellant's objection to
its admission.

[2]   The presence of the H A H steer in the corral on the
night in question does not tend in any manner to connect appel-
lant with the larceny of the circle K S steer.   It was not shown
that appellant put him in there or that appellant was present when
he was put in.    The evidence shows that cattle branded H A H,
circle K S, and perhaps several other brands to the number of
about 1,000 head were in charge of one Leslie Boe, who was
herding them on the open range just east and north of appel-
lant's pasture.   Boe was a witness for the state.   He testified that
the fence around appellant's pasture was down in places, and that
cattle could pass freely into and out from this pasture, and that
it was not unusual for cattle from his herd to wander into ap-
pellant's pasture and for cattle that belonged in appellant's pas-
ture to wander out among his cattle.   He also testified that some
time during the day on which appellant was arrested he rode
through appellant's pasture and that while in there he saw an
H A H steer.    Whether he was alone does not appear, but his
presence there seems to have occasioned no surprise, nor does he
appear to have taken the trouble to drive him out.    The evidence
on the part of the state does not establish a conspiracy between
appellant and the other defendants to steal or butcher the circle
K S steer or to commit other offense.

[3]   But, lastly, it is claimed by the state that, if the evidence
is not sufficient to establish a conspiracy, or to show that appel-
lant was an accessory before the fact, it is sufficient to show that
he was an accessory after the fact.   An accessory after the fact is
defined as follows:

"All persons who, after the commission of any felony, conceal or aid the offender, with knowledge that he has committed a felony, and with intent that he may avoid or escape from arrest, trial, conviction or punishment, are accessories." Section 3595, R. C. 1919.

There is not a suggestion of evidence in the record that brings appellant within this provisions of this law.

[4] Because of the insufficiency of the evidence to connect appellant with the offense charged a new trial must be granted. But there is one other assignment that will be noticed, so that in case of a retrial the same error will not be repeated. Appellant contends that he was improperly limited in his cross-examination of the officers who arrested him. These witnesses were examined by the state as to the transactions and conversations that took place with appellant at that time. Appellant then interrogated them further as to conversations and conduct of the parties there at that time. This was objected to as not proper cross-examination and the objection was sustained. We believe that under the circumstances this was error. We are not unmindful of the rule that gives the trial court a broad discretion relative to the scope and limit of cross-examination; but in this case the conversations and conduct that occurred at that time were so closely connected as to constitute but a single transaction, and appellant should have been allowed to go more fully into it.

The judgment and order appealed from are reversed.

SHERWOOD, J., not sitting.

Note.—Reported in 207 N. W. 547. See, Headnote (1), American Key-Numbered Digest, Larceny, Key-No. 53, 36 C. J. Sec. 473; (2) Larceny, Key-No. 49, 36 C. J. Sec. 483, Conspiracy, 12 C. J. Sec. 231; (3) Larceny, Key-No. 49, 36 C. J. Sec. 510; (4) Witnesses, Key-No. 268(1), 40 Cyc. 2480, 2492, 2512.

On Rev. Code 1919, Sec. 3595, see Annotations Kerr's Cyc. Code 1920, Penal Code, Sec. 32.